[Cite as *State v. Morlock*, 2014-Ohio-4458.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. Nos. 26954 |
|---|---|
| | 26955 |
| Appellee | 26956 |
| v. | |
| | APPEAL FROM JUDGMENT |
| MICHAEL A. MORLOCK | ENTERED IN THE |
| | COURT OF COMMON PLEAS |
| Appellant | COUNTY OF SUMMIT, OHIO |
| | CASE Nos. CR 12 10 3061(E) |
| | CR 11 08 2328 |
| | CR 13 08 0805(A) |

DECISION AND JOURNAL ENTRY

Dated: October 8, 2014

---

BELFANCE, Presiding Judge.

{¶1}  Defendant-Appellant Michael Morlock appeals from his convictions in the Summit County Court of Common Pleas.  For the reasons set forth below, we reverse his convictions for illegal manufacture of drugs (methamphetamine) and illegal assembly or possession of chemicals for the manufacture of drugs.[1]

I.

{¶2}  Late in the evening on October 27, 2012, police, including Officer Brent Bauknecht of the Akron Police Department, stopped and searched a vehicle which contained items associated with manufacturing methamphetamine.  Because of the presence of items associated with manufacturing methamphetamine, the officers called Officer David Crockett

---

[1] While Mr. Morlock has also filed appeals from other cases, i.e. case numbers 26955 and 26956, he has not asserted any assignments of error related to these cases.

who was a member of the Clandestine Laboratory Enforcement Team, to assist them with the investigation.

{¶3}    Officer Crockett received consent from the occupants of the vehicle, John Gargus and a woman, to search their home at 100 Willard.  At 100 Willard officers found additional items associated with the manufacture of methamphetamine.  Also while at 100 Willard, someone brought up the name of Wendy Jacobs, who had an outstanding misdemeanor arrest warrant and was believed to reside at 92 Willard, which was next door.  Additionally, officers also received information that there was a possible methamphetamine lab at 92 Willard.

{¶4}    Thus, when officers saw someone outside 92 Willard in the early morning hours of October 28, 2012, they proceeded over to investigate.  Officer Bauknecht testified that, "[a]s [officers] approached [92 Willard], somebody threw down a gun, and another person ran inside the house and slammed the door."  Police demanded that the individuals come out, and a female, Angelica Hoysak,[2] a resident of 92 Willard, answered the door.  Ultimately, police entered the home and found methamphetamine as well as numerous items associated with and used in the manufacture of methamphetamine.  Police arrested the three residents of the house:  Ms. Hoysak, Ms. Jacobs, and Dale Connell, who was dating Ms. Hoysak.  Additionally, police arrested the other people who were present in the house:  Jack Blaurock, Jericho Hill, Michael Morlock, and Jerri Delrossi.

{¶5}    In November 2012, Mr. Morlock was indicted on one count of illegal manufacture of drugs (methamphetamine) in violation of R.C. 2925.04(A), a felony of the second degree, and one count of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A), a felony of the third degree.  The indictment specified that the

---

[2] Ms. Hoysak's name is spelled three different ways in the record.  For consistency, this Court will use the spelling Ms. Hoysak gave at trial.

crimes took place "on or about the 28th day of October 2012[.]" The matter proceeded to a joint trial with Mr. Morlock's codefendant, Ms. Delrossi. A jury found Mr. Morlock guilty of both counts. The trial court found the offenses to be allied, and the State elected to sentence Mr. Morlock on the count for the illegal manufacture of drugs. Mr. Morlock was sentenced to five years in prison.

{¶6} Mr. Morlock has appealed, raising four assignments of error for our review. Additionally, Mr. Morlock has filed appeals from two other cases, appeal numbers 26955 and 26956; however, he has not raised any assignments of error related to these case numbers. These cases were nonetheless consolidated for purposes of appeal.

II.

ASSIGNMENT OF ERROR I

DUE PROCESS WAS DENIED AS EVIDENCE WAS INSUFFICIENT TO PROVE ILLEGAL MANUFACTURE OR ASSEMBLY OF DRUGS[.]

{¶7} Mr. Morlock asserts in his first assignment of error that there was insufficient evidence presented to find him guilty of either violating R.C. 2925.04(A) or R.C. 2925.041(A). We agree.

{¶8} "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Slevin*, 9th Dist. Summit No. 25956, 2012-Ohio-2043, ¶ 15. Whether a conviction is based on sufficient evidence is a question of law that this Court reviews de novo. *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the State has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins*, 78 Ohio St.3d at 390 (Cook, J. concurring). When a defendant challenges the sufficiency of the evidence, we do not evaluate credibility; rather, the Court must

examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶9} Mr. Morlock was found guilty of violating R.C. 2925.04(A), which states that "[n]o person shall * * * knowingly manufacture or otherwise engage in any part of the production of a controlled substance." R.C. 2925.01(J) defines manufacture as "to plant, cultivate, harvest, process, make, prepare, or otherwise engage in any part of the production of a drug, by propagation, extraction, chemical synthesis, or compounding, or any combination of the same, and includes packaging, repackaging, labeling, and other activities incident to production." Additionally, he was found guilty of violating R.C. 2925.041(A) which provides that "[n]o person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code." R.C. 2925.041(B) provides that,

> [i]n a prosecution under this section, it is not necessary to allege or prove that the offender assembled or possessed all chemicals necessary to manufacture a controlled substance in schedule I or II. The assembly or possession of a single chemical that may be used in the manufacture of a controlled substance in schedule I or II, with the intent to manufacture a controlled substance in either schedule, is sufficient to violate this section.

{¶10} Possession or possess "means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "A 'controlled substance' is 'a drug, compound, mixture, preparation, or substance included in schedule I, II, III, IV, or V.' R.C. 3719.01(C). Methamphetamine is classified as a controlled

substance. R.C. 3719.41 Schedule II(C)(2)." *State v. Gerhart,* 9th Dist. Summit 24384, 2009-Ohio-4165, ¶ 13.

{¶11} At trial, only three people testified: Ms. Hoysak, Officer Bauknecht, and Officer Crockett.

{¶12} Officer Crockett testified about the manufacturing process of methamphetamine via the "shake and bake" method involved in this case. Officer Crockett explained that there are two phases to the process. The first involves taking the lithium strips from the inside of batteries, ammonium nitrate (which is found inside cold packs), lye/drain cleaner, Coleman fuel, and crushed pseudoephedrine pills and putting them all in a two-liter plastic bottle and shaking them for anywhere from 40 minutes to an hour. Pressure from the toxic ammonia gas building up inside the container has to be released periodically during the process. A liquid "meth oil" is thereby created which is siphoned off using coffee filters. The next phase, called "gassing[,]" involves placing the meth oil in a glass jar and using the gas created from either muriatic acid and aluminum foil or sulfuric acid and salt to crystalize the methamphetamine. Tubing is used to introduce the gas into the meth oil. The crystalized methamphetamine is then poured on to coffee filters and allowed to dry.

{¶13} Officer Crockett explained that, because some methamphetamine will become trapped in the fibers of the coffee filters, people will put the coffee filters in their drinks to extract more methamphetamine or will use water or isopropyl alcohol to extract the last traces of methamphetamine. Officer Crockett could not remember whether this method of further extraction was used by the occupants of 92 Willard, although Ms. Hoysak admitted to using it.

{¶14} Officer Crockett also described the hazardous nature of the chemicals involved in and created from manufacturing methamphetamine. Many of them are toxic and some are also

fire hazards. For instance, if the lithium from the batteries is exposed to any moisture, it will ignite. The sludge created from the manufacturing process that would need to be disposed of would also include many hazardous chemicals.

{¶15} Ms. Hoysak testified that she began using methamphetamine in November 2011 through an ex-boyfriend. Also in November 2011, she met Mr. Connell, who cooked methamphetamine using the "shake and bake" method. Sometime thereafter, the two began dating, and Ms. Hoysak moved in with him at 92 Willard in August 2012. At some point, prior to the events in this case, Ms. Hoysak was arrested with her ex-boyfriend after items used in the manufacture of methamphetamine were found in a car.[3] Mr. Hoysak went to jail for a period of time and then briefly stayed with her mom prior to moving back in with Mr. Connell in September 2012. In September 2012, Ms. Jacobs, an ex-girlfriend of Mr. Connell, was also living at 92 Willard. According to Ms. Hoysak, Mr. Connell would make methamphetamine both in and outside the residence. Ms. Hoysak testified that she would buy ingredients used to make methamphetamine, watch Mr. Connell make methamphetamine, and also help in the manufacturing process. She stated that, in exchange for buying supplies, she would receive methamphetamine or money. Ms. Hoysak testified that the waste created from the manufacturing process would be put in trash bags, sealed (to prevent it from catching fire), and would then be taken out and put in someone else's trash. Taking the trash out not only reduced the fire risk to the property but also got rid of some of the evidence. She testified that she had taken the trash out before.

{¶16} Ms. Hoysak and Mr. Connell were friends with the residents of 100 Willard and she testified that sometimes they would go over to 100 Willard and Mr. Connell would cook with

---

[3] Ms. Hoysak ultimately pleaded guilty and was out on bond at the time of the October 28, 2012 raid on 92 Willard.

John Gargus, whom Mr. Connell taught to manufacture methamphetamine. Ms. Hoysak indicated that sometimes Mr. Gargus would use their supplies to manufacture methamphetamine.

{¶17} Ms. Hoysak met Ms. Delrossi and Mr. Morlock sometime around August 2012, and they became friends. She indicated that Ms. Delrossi and Mr. Morlock were a couple and that they would come over to get high. Ms. Hoysak stated that Ms. Delrossi would give Mr. Connell money, Sudafed, or chemicals (such as cold packs) in exchange for methamphetamine. Mr. Morlock would also give cold packs or Sudafed in exchange for methamphetamine. Ms. Hoysak averred that Mr. Morlock and Ms. Delrossi brought the Sudafed or cold packs over 5 or 6 times in the month prior to the raid at 92 Willard; however, there was no testimony that Ms. Delrossi or Mr. Morlock brought over any chemicals on or about October 28, 2012. Ms. Hoysak indicated that Ms. Delrossi and Mr. Morlock would bring the ingredients over, leave, and then Ms. Hoysak or Mr. Connell would call them a few hours later when the methamphetamine was made. Ms. Delrossi and Mr. Morlock would then return and they would get high. Sometimes Ms. Delrossi and Mr. Morlock would take the trash out from these cooks and sometimes Ms. Hoysak would. Notably, there was no testimony that Ms. Delrossi or Mr. Morlock took the trash out on or about October 28, 2012. Officer Crockett explained that this type of behavior, i.e. buying chemicals used to make methamphetamine for the manufacturer in exchange for money or methamphetamine, was referred to as "Smurfing[.]"

{¶18} Ms. Hoysak testified that, on October 28, 2012, she observed Jordan Strange call Ms. Delrossi and ask for a ride home. Accordingly, it was Ms. Hoysak's testimony that that was the reason Ms. Delrossi and Mr. Morlock were at 92 Willard on October 28, 2012, i.e. to give Mr. Strange a ride. However, at the point in time that they arrived at 92 Willard, Mr. Strange was at 100 Willard, "probably getting his stuff ready." Also present at 92 Willard that early morning were Mr. Hill, Mr. Blaurock, Ms. Hoysak, Ms. Jacobs, and Mr. Connell. At the time, Ms. Jacobs was sleeping in her room. Mr. Blaurock had brought over Sudafed and guns to trade for methamphetamine and was about to leave with Mr. Hill when police came over to the house. Ms. Hoysak testified that, while methamphetamine was not manufactured in the house that day, there were approximately 3 grams from the prior cook and they were planning to get high when police came in. Mr. Connell had lined up four lines of methamphetamine on the speaker, one each for himself, Ms. Hoysak, Ms. Delrossi, and Mr. Morlock. When police arrived, Mr. Connell fled to the basement and hid, and Mr. Morlock blew the lines of methamphetamine off the speaker. Near where Ms. Delrossi and Mr. Morlock were sitting, a pink pouch containing straws and an Altoids container and a Diablo scale were found. Ms. Hoysak identified the pink pouch, the Altoids container and the scale as belonging to Ms. Delrossi. Inside the Altoids container was a vial of methamphetamine, a pen used in snorting or smoking methamphetamine, and a knife used to cut up methamphetamine. Ms. Hoysak acknowledged that Mr. Morlock was always with Ms. Delrossi when she would bring over the above mentioned supplies. Additionally, there was testimony that isopropyl alcohol was found within the vicinity of Ms. Delrossi and Mr. Morlock; however, it is not clear if this bottle was the same bottle later attributed to Mr. Connell.

{¶19} Officer Crockett proceeded downstairs and encountered a strong ammonia smell coming from the basement. There he found Mr. Connell in the process of attempting to discard a box of pseudoephedrine pills. In addition, in his search of the house, Officer Crockett found

> several pills and other items used to manufacture in the basement which was where [Mr. Connell] was. There was a garbage bag. Inside that garbage bag was actually the contents from an ammonium nitrate [(shake and bake)] cook * * *. We also found several snorting straws, digital scales, methamphetamine, remnants of meth lab being the trash from a meth lab inside the house and outside in the garbage.

{¶20} In the kitchen/dining area, police found a bag containing unopened lithium batteries. There was also a pipe cutter, electrical tape, and a pair of pliers. Additionally, there was a bottle of isopropyl alcohol containing a green liquid that police learned that Mr. Connell used "to put on his head because he thought he had worms in his head." A grinder used to chop up pseudoephedrine pills, portions of batteries, and empty battery boxes were found in the basement. In unspecified locations, police found coffee filters that were still wet and stained, snort straws, a bottle with tubing, cold pack boxes, mason jars, measuring cups, twisted aluminum foil, multiple cans of Coleman fuel, a Hawaiian Punch bottle that had trace amounts of manufacturing waste in it, and empty cold packs. In the kitchen cabinet in a Kraft parmesan cheese container police found a mixture of ammonium nitrate and lye. Based upon everything found in the house, Officer Crockett believed that methamphetamines were last manufactured in that house "[t]hrough a couple weeks period." He later specified that he thought methamphetamine was manufactured at 92 Willard within a day or two of October 28, 2012, based upon the condition of the materials found.

{¶21} Ms. Hoysak estimated that Mr. Connell last made methamphetamine within a few days of October 28, 2012, and the last batch could have possibly been made on October 26, 2012. However, Ms. Hoysak could not remember with certainty the last time Ms. Delrossi and

Mr. Morlock were at 92 Willard. She estimated that they were last there over a week prior to October 28, 2012, but it may have been longer than that. Ms. Hoysak also estimated that the last time Ms. Delrossi and Mr. Morlock brought ingredients over to make methamphetamine was two weeks prior to October 28, 2012, and that Mr. Connell would have used the ingredients that same day in making methamphetamine.

{¶22} Initially, when questioned by police, Ms. Hoysak denied Ms. Delrossi's and Mr. Morlock's involvement with the methamphetamine production. At trial, she indicated that she did so because they were her friends and because Mr. Morlock was in a motorcycle gang and she was afraid of possible repercussions if she were to implicate him. Ms. Hoysak ultimately agreed to testify truthfully against Ms. Delrossi and Mr. Morlock in exchange for a guilty plea to attempted manufacturing. She received a suspended sentence for her role in the events of October 28, 2012. During his interview with police, Mr. Morlock was not very forthcoming but did state that "he has been down for this same thing and he was taking his chances."

{¶23} This Court is well aware that "'[o]rdinarily the precise dates and times are not essential elements of the offense[] and a certain degree of inexactitude of averments, where it relates to matters other than elements of the offense, is not fatal to the prosecution.'" *State v. Forney,* 9th Dist. Summit No. 24361, 2009-Ohio-2999, ¶ 10, quoting *State v. Adams*, 5th Dist. Licking No. 02-CA-00043, 2002-Ohio-5953, ¶ 8, citing *State v. Sellards*, 17 Ohio St.3d 169, 171 (1985). "The State is only required to prove that the offense occurred reasonably near the date specified in the indictment." *Forney* at ¶ 10. Thus, when a specific date is stated in an indictment, and the indictment is not later amended, courts do examine whether the evidence supports a finding of guilt on a date reasonably near the specified date. *See State v. Sicilian,* 10th Dist. Franklin No. 93AP-467, 1993 WL 524869, *3 (Dec. 14, 1993) ("[D]efendant stood charged

with having violated the statute on or around December 10, 1987. Even if the date is not an essential element of the offense, the indictment is meant to apprise defendant of the approximate date on which the offense allegedly occurred. The evidence does not support her having violated R.C. 2905.04 at any time in the vicinity of December 10, 1987[.]"); *In re T.K.,* 2d Dist. Montgomery No. 24613, 2011-Ohio-5024, ¶ 18-20; *State v. McGill,* 2d Dist. Greene No. 99CA25, 2000 WL 1803650, *3-*6 (Dec. 8, 2000); *State v. Scruggs,* 136 Ohio App.3d 631, 635-636 (2d Dist.2000); *State v. Ruff,* 5th Dist. Fairfield No. 39-CA-01, 1992 WL 319000, *4-*5 (Nov. 2, 1992) (concluding the verdict was against the manifest weight of the evidence where the indictment specified a particular date, the medical evidence did not support the conclusion that the crime occurred on that date, and the State did not allege in the indictment that the offense "occurred on more than one occasion over an extended period of time[]").

**{¶24}** Here, while the State did try to amend the indictment to include the month prior to the October 28, 2012 raid, the trial court denied that motion. The propriety of the trial court's ruling is not before this Court on appeal. Thus, the State was left with an indictment that stated the crimes at issue occurred on or about October 28, 2012. Additionally, we note that the State's motion for a jury instruction on complicity was denied. Therefore, this Court must consider whether sufficient evidence exists whereby a reasonable trier of fact could conclude beyond a reasonable doubt that, on or about October 28, 2012, Mr. Morlock knowingly possessed "one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code." R.C. 2925.041(A). Additionally, we must consider whether on or about that same date the evidence supports his conviction for the illegal manufacture of methamphetamine in violation of R.C. 2925.04.

{¶25} Even after viewing the evidence in a light most favorable to the prosecution, we cannot say that the State met its burden. We cannot say that the State demonstrated that, on or about October 28, 2012, Mr. Morlock either "knowingly * * * possess[ed] one or more chemicals that may be used to manufacture [methamphetamine] with the intent to manufacture [methamphetamine,]" R.C. 2925.041(A), or "knowingly manufacture[d] or otherwise engage[d] in any part of the production of [methamphetamine]." R.C. 2925.04(A). There was no evidence that methamphetamine was being made or disposed of on October 28, 2012. *See State v. Myers,* 9th Dist. Summit No. 23435, 2007-Ohio-2737, ¶ 17 (including disposal as part of the manufacturing process). Nor was there any evidence that Mr. Morlock possessed or assembled any chemical on or about October 28, 2012. And while there was evidence that methamphetamines were being manufactured at 92 Willard as recently as a couple days prior to October 28, 2012, a time period that could possibly fall within on or about October 28, 2012, there was no evidence that Mr. Morlock was involved or engaged in that production. Ms. Hoysak was never specifically asked whether Ms. Delrossi and Mr. Morlock were present or participating in the last cook. The testimony she gave was that Ms. Delrossi and Mr. Morlock were last at 92 Willard at least a week before October 28, 2012. Thus, there was no evidence that Ms. Delrossi and Mr. Morlock were at 92 Willard the last time methamphetamine was manufactured there several days prior. Further, there was not even evidence that the supplies used in the most recent cook, occurring several days before October 28, 2012, were purchased or supplied by Ms. Delrossi or Mr. Morlock.[4] Thus, we cannot say there was sufficient evidence to convict Mr. Morlock of manufacturing methamphetamine on or about October 28, 2012.

---

[4] Likewise, there was no evidence that Mr. Morlock disposed of methamphetamine waste on or about October 28, 2102. Ms. Hoysak stated that Mr. Morlock had disposed of

**{¶26}** With respect to the conviction for violating R.C. 2925.041, we also conclude there was insufficient evidence to conclude Mr. Morlock "knowingly * * * possess[ed] one or more chemicals that may be used to manufacture [methamphetamine] with the intent to manufacture [methamphetamine]" on or about October 28, 2012. R.C. 2925.041(A). There was no evidence that, on or about October 28, 2012, Mr. Morlock possessed any chemicals or supplied any chemicals to make methamphetamine to Mr. Connell or anyone at 92 Willard. The testimony was that, when Mr. Morlock came over to 92 Willard, he did not have any chemicals used to make methamphetamines with him, and there was no evidence to the contrary. Ms. Hoysak testified that the last time Ms. Delrossi and Mr. Morlock brought over chemicals used in the manufacture of methamphetamine was two weeks prior to October 28, 2012.

**{¶27}** The State argues that, because there were left over chemicals at 92 Willard on October 28, 2012, and there was testimony that Ms. Delrossi and Mr. Morlock brought over supplies to make methamphetamine 5 or 6 times in the month prior to October 28, 2012, then it is reasonable to conclude that the leftover supplies were those Ms. Delrossi or Mr. Morlock purchased and that they were used in the manufacture or illegal assembly on or about October 28, 2012. There was no evidence to support this theory. Neither Ms. Hoysak nor any other witness testified that the items found in the premises were the items Mr. Morlock had supplied. Instead, the State's argument relies entirely upon speculation. There was no testimony that the products found during the October 28, 2012 raid were assembled or possessed by Mr. Morlock. We note that there was testimony that other people brought over supplies to make methamphetamine to 92 Willard and that sometimes the supplies at 92 Willard were used by Mr.

methamphetamine waste on more than one occasion during the month prior to October 28, 2012. However, there was no testimony he did so on or about October 28, 2012.

Gargus in his cooks at 100 Willard. However, there was no evidence that linked the chemicals found at 92 Willard as having been assembled or possessed by Mr. Morlock. Accordingly, we conclude that the State failed to present sufficient evidence that, on or about October 28, 2012, Mr. Morlock violated R.C. 2925.041(A).

{¶28} In light of the foregoing, we conclude that the State failed to present sufficient evidence that, on or about October 28, 2012, Mr. Morlock violated either R.C. 2925.04 or R.C. 2925.041(A). Mr. Morlock's first assignment of error is sustained.

ASSIGNMENT OF ERROR II

THE CONVICTIONS FOR ILLEGAL MANUFACTURE AND ASSEMBLY ARE CONTRARY TO LAW, IN PLAIN ERROR, AND A VIOLATION OF DUE PROCESS BECAUSE THE JURY VERDICTS DID NOT INCLUDE THE DEGREE OF OFFENSE, OR NAME THE DRUG OR ADD ANY AGGRAVATING FACT.

ASSIGNMENT OF ERROR III

DUE PROCESS WAS DENIED AS THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

ASSIGNMENT OF ERROR IV

FAILURES TO MOVE TO SUPPRESS STATEMENTS AND TO CHALLENGE THE MANDATORY MINIMUM FIVE[-]YEAR SENTENCE DENIED THE CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL[.]

{¶29} In light of our resolution of Mr. Morlock's first assignment of error, his remaining assignments of error have been rendered moot, and we decline to address them. *See* App.R. 12(A)(1)(c).

III.

**{¶30}** Based upon the foregoing, the judgment of the Summit County Court of Common Pleas related to appeal number 26954 is reversed, and the matter is remanded so that the trial court can reflect the same in its entry.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

EVE V. BELFANCE
FOR THE COURT

MOORE, J.
CONCURS.

CARR, J.
DISSENTING.

{¶31} I respectfully dissent. I would conclude, based on the evidence presented, that the State presented sufficient evidence to prove that Morlock possessed chemicals and participated in the manufacture of methamphetamine on or about October 28, 2012.

{¶32} During the State's case-in-chief, Ms. Hoysak testified that she, Morlock, and Jerri Delrossi would routinely provide various ingredients necessary for the production of methamphetamine in exchange for some of the finished product. After dropping off the ingredients, Delrossi and Morlock would leave until they received a call a few hours later informing them that the methamphetamine had been made. They would then return to the residence to use their share of the drugs. When the police entered the residence early in the morning on October 28, 2012, they saw four lines of methamphetamine laid out on a speaker where Delrossi, Morlock, Hoysak, and another man were preparing to use the drugs. The reasonable inference to be drawn from Ms. Hoysak's testimony is that Morlock had possessed and provided chemicals for the manufacture of the methamphetamine that he was about to use that morning. Although Ms. Hoysak testified that no one had cooked methamphetamine at the residence that day, it is reasonable to infer that Morlock, who was paid for providing chemicals with a portion of the manufactured drug, had very recently possessed and provided chemicals for this batch. The evidence demonstrated that it takes only a few hours to produce methamphetamine. Morlock returned to the residence early in the morning of October 28, 2012, and was preparing to use the drugs. The reasonable inference is that he had provided the chemicals sometime within the last day, and he had returned to collect his fee in kind. Accordingly, I would conclude that the State presented sufficient evidence to prove that Morlock possessed chemicals and participated in the manufacture of methamphetamine on or about

October 28, 2012. Therefore, I would overrule the first assignment of error and address the remaining assignments of error.

APPEARANCES:

MARK H. LUDWIG, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.