[Cite as *State v. Henderson*, 2014-Ohio-5782.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27078 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ALFONZO HENDERSON | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 12 08 2452 |

DECISION AND JOURNAL ENTRY

Dated: December 31, 2014

WHITMORE, Judge.

{¶1} Appellant, Alfonzo Henderson, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms in part and reverses in part.

I

{¶2} In September 2012, Henderson was indicted for possession of cocaine and having weapons while under disability. These charges related to items found during the execution of a search warrant of 110 West Miller Avenue in Akron. While these charges were pending, a supplemental indictment was filed, charging Henderson with aggravated burglary, aggravated robbery, felonious assault, and having weapons while under disability. The charges in the supplemental indictment stemmed from an incident that occurred on January 2, 2013.

{¶3} On January 2, 2013, Richard Ellis was home with the flu when Henderson and two other men kicked in his front door. According to Ellis, Henderson shot him multiple times while asking him, "Where's it at?" Ellis recognized Henderson as his brother's first cousin.

After briefly searching Ellis' apartment, the three men fled. The police responding to the scene ultimately found large quantities of heroin, cocaine, and marijuana in Ellis' apartment. Based on Ellis' identification, the charges in the supplemental indictment were filed against Henderson and he was arrested.

{¶4}   Henderson sought to sever his trial on the two indictments, but the court denied his motion. A jury acquitted Henderson of the possession of cocaine and having weapons while under disability charges from September 2012. However, the jury convicted Henderson of all charges in the supplemental indictment. The court merged the aggravated robbery into the aggravated burglary and sentenced Henderson to seven years on aggravated burglary. The court further sentenced Henderson to seven years on felonious assault, one year on having weapons while under disability, and three years for each of the two firearm specifications. The court ordered the sentences for aggravated burglary and felonious assault to run consecutively, for an aggregate prison term of 21 years.

{¶5}   Henderson now appeals and raises three assignments of error for our review.

II

Assignment of Error Number One

ALFONZO HENDERSON'S CONVICTIONS FOR AGGRAVATED BURGLARY, AGGRAVATED ROBBERY, FELONIOUS ASSAULT, GUN SPECIFICATIONS, AND HAVING WEAPON WHILE UNDER DISABILITY WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶6}   In his first assignment of error, Henderson argues that his convictions are not supported by sufficient evidence because the only evidence against him is the "uncorroborated testimony of the victim." We disagree.

{¶7} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, the evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶8} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

{¶9} "[I]dentity is an element that must be proven by the state beyond a reasonable doubt * * *." (Alterations sic.) *In re C.A.*, 9th Dist. Summit No. 26690, 2013-Ohio-3903, ¶ 5, quoting *State v. Minor*, 9th Dist. Summit No. 26362, 2013-Ohio-558, ¶ 9. Henderson contends that the State failed to prove that he was the one who broke into Ellis' house and shot him. Specifically, Henderson argues that Ellis' uncorroborated testimony is insufficient to support his convictions. Henderson, essentially, challenges Ellis' credibility. "When a defendant challenges the sufficiency of the evidence, we do not evaluate credibility." *State v. Delrossi*, 9th Dist. Summit No. 26943, 2014-Ohio-4457, ¶ 8. *Accord In re C.A.* at ¶ 5 ("[W]hile identity is an element that must be proven by the state beyond a reasonable doubt, the credibility of the witnesses and their degree of certainty in identifying the defendant are matters affecting the weight of the evidence."). "The relevant inquiry is whether, after viewing the evidence in a light

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. Because Henderson's first assignment of error challenges sufficiency and not manifest weight, this Court need not assess Ellis' credibility. *See State v. Brown*, 9th Dist. Summit No. 25287, 2011-Ohio-1041, ¶ 14, citing *State v. Porter*, 9th Dist. Summit No. 24996, 2010-Ohio-3980, ¶ 9 ("[A] sufficiency challenge tests the State's production of evidence, not the persuasiveness of the evidence produced.").

{¶10} Ellis testified that Henderson and two other men kicked in his front door. Henderson then shot Ellis and asked, "Where's it at?" When Ellis replied that he did not know what Henderson was talking about, Henderson shot him again. Henderson shot Ellis four times. According to Ellis, after he was shot, Henderson instructed the two other men to search Ellis' home. All three men fled shortly thereafter when Henderson threatened to shoot Ellis in the forehead. Ellis told the police that his brother's first cousin, Al, was the shooter. He further identified a photograph of Henderson as the person he knew as Al. Ellis' testimony, if believed, is sufficient to support Henderson's convictions.

{¶11} Henderson's first assignment of error is overruled.

Assignment of Error Number Two

ALFONZO HENDERSON'S CONVICTIONS FOR AGGRAVATED BURGLARY, AGGRAVATED ROBBERY, FELONIOUS ASSAULT, GUN SPECIFICATIONS, AND HAVING WEAPON WHILE UNDER DISABILITY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶12} In his second assignment of error, Henderson argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶13}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Id.*, quoting *Black's* at 1594.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**{¶14}** Henderson argues that his convictions are against the manifest weight of the evidence because: (1) there is no forensic evidence tying Henderson to the shooting; (2) his cell phone records indicate that he was across town at 7:17 p.m.; (3) Ellis is not credible; and (4) the police improperly presented a photograph to Ellis for identification.

**{¶15}** Ellis testified that on the evening of January 2, 2013, he was home sick with the flu. He heard a special knock at the door and thought it was one of his cousins but decided not to answer. Ellis described the special knock as "[k]nock, knock, knock, knock, knock, knock-knock." Ellis testified that someone then kicked in his door and he jumped up to see three intruders. Ellis recognized one of them as Henderson. Ellis described Henderson's facial

expression as surprised. Ellis, then, picked up a piece wood from the broken door frame and stepped out onto his enclosed front porch. Discovering the invaders still on the porch, Ellis began swinging the piece of wood at them. According to Ellis, that is when Henderson shot him.

{¶16} Ellis stated that after he was shot, he fell back into the house and onto his knees. Henderson stood over Ellis and asked him, "Where's it at?" When Ellis replied that he did not know what Henderson was talking about, Henderson shot him again. After Henderson shot Ellis four times, Henderson instructed the others to search the house. Ellis was unsure how long the men searched, but said that it was not long. According to Ellis, Henderson then told Ellis that "the next [bullet] is going to be in your m***** f****** forehead." One of the men then asked Henderson, "[w]hat the f*** are you doing?", and ran out of the house. Ellis said Henderson and the other intruder followed. Ellis testified that after the men left he fell, crawled into his dining room, and called his brother to tell him that Henderson had shot him. Ellis then called his sister and asked her to call the police. Ellis explained that he called his family because he thought he was going to die. He still thought he was going to die when the police arrived and he identified Henderson as the person who shot him.

{¶17} According to Ellis, the special knock used that night is the one that is used by some of his family members. Ellis could not explain how Henderson would have known about the knock. Ellis admitted that the police officers responding to the scene ultimately found large quantities of heroin, cocaine, and marijuana in his apartment. He testified that he had pleaded guilty to trafficking in heroin, a felony of the second degree, and was awaiting sentencing. Ellis said the State did not make any promises for his testimony in this case. Additionally, Ellis acknowledged that he had a prior conviction for possession of cocaine.

{¶18} Officer Marvin Murphy testified that about 7:17 p.m. on January 2, 2013, he responded to a call about shots fired. When Officer Murphy arrived he observed the front door kicked in and a gunshot victim, later identified as Ellis, lying on the floor in the living room. Officer Murphy called for EMS and conducted a protective sweep of the house. He observed crack cocaine and a large bag of marijuana in the living room. Officer Murphy testified that when he asked Ellis who shot him, Ellis replied, "Al."

{¶19} Detective Glenn Payne testified that he interviewed Ellis at the hospital shortly after the shooting and Ellis identified his shooter as his brother's first cousin, Al. Detective Payne was only able to speak to Ellis for a short time because he was "in grave danger of dying." Therefore, Detective Payne said he focused his questions on identifying the person who shot Ellis. According to Detective Payne, Ellis told him that Al knocked on his door three times, three knocks each time. Al then kicked in his front door and asked him "Where['s] it at?" When Ellis replied, "What the F you talking about?", Al shot him. Ellis identified the gun used as a semi-automatic 9 mm, dark in color.

{¶20} Detective Mildred Morris works for the Akron Police Department in its Crime Scene Unit. Detective Morris testified that she responded to the scene of the shooting at approximately 7:30 p.m. The Crime Scene Unit recovered four 9 mm shell casings on the enclosed porch and two 9 mm casings in the living room. She noted that the blood throughout the apartment indicated that the victim had moved about. Detective Morris testified that she did not attempt to fingerprint the shell casings because fired ammunition is never tested. According to Detective Morris, any DNA on a casing would be burned off when it is fired. Detective Morris testified that a scuff mark was left on the front door, but no testing was done to determine

the source of that mark. Additionally, no attempt was made to collect trace evidence from the broken door facing.

{¶21} Sergeant David Garro was the lead investigator in Ellis' shooting. Sergeant Garro testified that he responded to the scene of the shooting while Detective Payne interviewed Ellis at the hospital. Sergeant Garro spoke with Officer Murphy who informed him that Ellis had identified the shooter as a man named Al. He spoke with the two neighbors who had called 911, but neither of them could provide a description of the shooter. Sergeant Garro testified that one witness saw someone running eastbound, but could not tell "whether it was male, female, black, white, young, old; nothing." Because the witness told Sergeant Garro that the person was fleeing eastbound, he determined that the footprints in the snow on the western part of the front yard were of no evidentiary value.

{¶22} Sergeant Garro then went to the hospital and spoke with Detective Payne. Detective Payne confirmed that Ellis had identified Al as the shooter. Sergeant Garro spoke with Ellis' family members at the hospital in an attempt to identify Al. Sergeant Garro testified that he was unable to identify Al until he received an anonymous phone call at the police station the following day. Sergeant Garro then took a photograph of Henderson to the hospital and Ellis identified the person in the photograph as Al, the person who had shot him.

{¶23} Sergeant Garro testified that he spoke with Henderson after his arrest. According to Sergeant Garro, Henderson told him that he was with his girlfriend, Ciera Moore, at her apartment from 4:30 p.m. to 7:30 p.m. on the evening of the shooting. Henderson told Sergeant Garro that around 7:30 p.m. he received a call from his cousin, Rudolph Patterson, telling him that Ellis, Patterson's brother, had been shot. Henderson told Sergeant Garro that he had met Ellis through Patterson and was at Ellis' home less than a week before the shooting. Sergeant

Garro testified that Henderson said "he would never shoot somebody, but maybe if it involved crack or something."

**{¶24}** Sergeant Garro also testified that a gunshot residue test was performed on Henderson, at his request, when he was arrested. According to Sergeant Garro, the test, even if positive, was of no evidentiary value because it was done two days after the shooting and the only reason the test was performed was because Henderson insisted. Henderson's gunshot residue test was negative.

**{¶25}** In an attempt to corroborate Henderson's alibi, Sergeant Garro obtained Henderson's cell phone records. Joseph Sierra a records custodian for T-Mobile testified to the cell towers Henderson's phone was using at various times on the night in question. According to Sierra, Henderson's cell phone was northeast of the Kenmore cell tower at 6:30 p.m., an area that includes Moore's apartment. However, his phone was moving from 6:43 p.m. to 7:05 p.m. At 6:43 p.m., Henderson's phone was using the north-northeast quadrant of the Arlington Street tower, an area that includes Ellis' address. At 7:05 p.m., his phone was south of the Johnston Street tower. After 7:05 p.m., there is no activity on Henderson's phone until 7:11 p.m. when it is back on the Kenmore tower. According to Sierra, Henderson's cell phone was located south of the Kenmore tower at 7:16 p.m. and 7:17 p.m. Moore's apartment is northeast of the Kenmore tower, and, according to Sierra, a phone at Moore's address would not connect to the south quadrant of the Kenmore tower.

**{¶26}** Sergeant Garro also spoke with Ciera Moore in an attempt to verify Henderson's alibi. Sergeant Garro testified that when he and Detective Payne went to speak to Moore at her house a few days after the shooting, Moore fled out the back of the house and called 911 because she thought they "were a hit squad from Detroit." Moore testified that when two detectives

knocked on her door, she called 911 and ran out of the back of the house because she thought someone was there to retaliate against her. Moore explained that she became frightened because she did not see a police car and they did not respond to her questions asking who was there. Sergeant Garro did eventually interview Moore. Moore told Sergeant Garro that Henderson was at home with her around the time of the shooting.

{¶27} At trial, Moore testified that Henderson was home when she arrived about 5 p.m. She explained that Henderson left for a short while to buy marijuana, but that he was home when she went to pick the kids up just before 7 p.m. Moore testified that based on the daycare sign out sheet she picked the kids up at 6:58 p.m. and that the daycare was only five minutes from her house. According to Moore, Henderson was home when she returned with the kids and the two were together at 7:17 p.m., when Henderson received a phone call telling him about the shooting. Henderson's cell phone records show a call was placed to Moore's cell phone at 6:52 p.m. and lasted two minutes. Moore agreed that, while the two were no longer dating, she cared about Henderson and did not want to see him in trouble. Moore also testified that it is hard raising three kids and that if Henderson is incarcerated he will not be able to help raise the child they have together.

{¶28} The recording of two 911 calls made around the time of the shooting were also played at trial. The first call, at 7:17 p.m., was made by Ellis' next door neighbor. The neighbor informed the 911 operator that his next door neighbor was being robbed. He explained that he could not see anything, but heard the door get kicked in and three or four gunshots. 911 received a second call shortly thereafter by another neighbor. This neighbor heard six gunshots and saw three people run out of Ellis' house and up the street. The persons got into a blue or black car and "haul[ed] ass" toward Arlington Street.

{¶29} Henderson contends that the weight of the evidence does not support a conclusion that he was at Ellis' house at the time of the shooting because his cell phone was connected to a cell tower across town at 7:17 p.m. The jury was presented with the evidence of his cell phone's location at various times between 6:30 p.m. and 7:17 p.m. It was fully aware that the phone was in the area of Ellis' home at 6:43 p.m. and across town from 7:11 p.m. to 7:17 p.m. The jury, however, could have reasonably concluded that Henderson had given his phone to someone else to create an alibi. While Moore testified that she was with Henderson at 7:17 p.m. when he was notified of the shooting, the jury could have chosen to discredit her testimony. Moore testified that she cared for Henderson and did not want to see him in trouble. Further, Moore admitted that she was frightened of possible retaliation and that Henderson would not be able to help raise their child if he were incarcerated.

{¶30} Henderson further argues that his convictions are against the manifest weight of the evidence because there is no forensic evidence tying Henderson to the shooting and Ellis is not a credible witness. To the extent that Henderson argues the police improperly presented a photograph to Ellis for identification, he has not developed this argument beyond a general attack on Ellis' credibility.

{¶31} The lack of physical evidence is not dispositive, but merely a factor for the jury to weigh, *see State v. Horton*, 9th Dist. Summit No. 26407, 2013-Ohio-3902, ¶ 38, and evaluating the evidence and assessing the credibility of the witnesses are primarily for the trier of fact, *State v. Persinger*, 9th Dist. Lorain No. 13CA010397, 2014-Ohio-4125, ¶ 13, quoting *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994). Defense counsel questioned Detective Morris and Sergeant Garro about evidence that was and was not collected at the scene. Additionally, defense counsel thoroughly cross-examined Ellis and the jury was fully informed of his criminal

convictions. Ellis told Officer Murphy at the scene that "Al" shot him. Shortly thereafter, Ellis told Detective Payne that his brother's first cousin, Al, shot him. The following day, Ellis confirmed, through a photograph, that Henderson was the person he was calling Al. Throughout his testimony at trial, Ellis maintained that Henderson was his brother's first cousin and was the person that broke into his house and shot him.

**{¶32}** After a careful review of the record, we cannot conclude that this is the exceptional case where the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See Otten*, 33 Ohio App.3d at 340. Henderson's second assignment of error is overruled.

<u>Assignment of Error Number Three</u>

THE TRIAL COURT ERRED IN IMPOSING A MAXIMUM AND CONSECUTIVE SENTENCES UPON ALFONZO HENDERSON, IN VIOLATION OF THE DUE PROCESS AND DOUBLE JEOPARDY CLAUSES OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶33}** In his third assignment of error, Henderson argues that the court erred in sentencing him: (1) on allied offenses, (2) to the maximum for felonious assault, and (3) to consecutive sentences.

**Allied Offenses**

**{¶34}** "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23. R.C. 2941.25 provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

Thus, two or more offenses arising from the same conduct and similar import only may result in one conviction. R.C. 2941.25(A). Two or more offenses may result in multiple convictions, however, if: (1) they are offenses of dissimilar import; (2) they are separately committed; or (3) the defendant possesses a separate animus as to each. R.C. 2941.25(B).

**{¶35}** A trial court's determination of whether offenses are allied offenses of similar import is reviewed de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1.

**{¶36}** In determining whether two offenses are allied offenses of similar import, the court first must determine "whether it is possible to commit one offense *and* commit the other with the same conduct." (Emphasis sic.) *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 48. "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Johnson* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., concurring in judgment only). If the answer to both questions is yes, the offenses will merge. *Johnson* at ¶ 50.

**{¶37}** Henderson argues that the court erred in failing to find that his aggravated burglary and felonious assault counts were allied offenses of similar import. Specifically, Henderson argues that because he was charged with aggravated burglary under R.C. 2911.11(A)(1), it must be merged with the felonious assault.

**{¶38}** R.C. 2911.11(A)(1) provides, in relevant part, that "[n]o person, by force * * * shall trespass in an occupied structure * * * when another person other than an accomplice of the

offender is present, with purpose to commit in the structure * * * any criminal offense * * * [and t]he offender inflicts, or attempts or threatens to inflict physical harm on another." Felonious assault prohibits a person from knowingly causing serious physical harm to another or causing or attempting to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(1)/(2).

{¶39} Henderson acknowledges that his indictment on aggravated burglary included the alternative subsection of R.C. 2911.11(A)(2). R.C. 2911.11(A)(2) provides, in relevant part, that "[n]o person, by force * * * shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense * * * [and t]he offender has a deadly weapon * * * on or about the offender's person or under the offender's control." The jury verdict form on the aggravated burglary count also included both subsections of R.C. 2911.11(A). Henderson, however, only argues that his conviction under subsection (1) should merge with his felonious assault. He advances no argument that a conviction under R.C. 2911.11(A)(2) should merge.

{¶40} Ellis testified that on the evening of the shooting his car was parked in the neighbor's driveway and not in front of his house. He heard someone knock a couple of times on his door, but decided not to answer because he was sick with the flu. After the knocking, Ellis testified that his door was kicked in and Ellis jumped up to see Henderson and two other intruders. Ellis described Henderson's facial expression as one of surprise. Ellis speculated that Henderson was probably surprised to find him home because he did not answer the knocks at the door and his car was not parked out front.

{¶41} Ellis testified that after the door was kicked in he thought the intruders had run outside, off of the enclosed porch. Ellis stated that he "went slowly towards the front porch,"

picking up a piece of wood from the broken door frame on his way. When he stepped out of the front door onto the enclosed porch, he began "hitting, swinging" the piece of wood at the intruders. At that point, Ellis said, he was shot by Henderson.

{¶42} Under R.C. 2911.11(A)(2) the aggravated burglary was completed at the time Henderson, having a firearm on his person, kicked in Ellis' front door. Therefore, we conclude that the aggravated burglary and the felonious assault were not committed by the same conduct. *See State v. Linde*, 9th Dist. Summit No. 26714, 2013-Ohio-3503, ¶ 19. Henderson's third assignment of error, as it relates to allied offenses, is overruled.

**Maximum Sentence for Felonious Assault**

{¶43} When reviewing a trial court's sentence, this Court applies a two-step approach. *E.g., State v. Fernandez*, 9th Dist. Medina No. 13CA0054-M, 2014-Ohio-3651, ¶ 5. "First, [we] must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, ¶ 26. If the sentence is not contrary to law, we review the trial court's decision in imposing a term of imprisonment for an abuse of discretion. *Id*. An abuse of discretion indicates that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶44} "Although a sentencing judge must consider the principles and purposes of sentencing in imposing a sentence, he or she is not required to make findings or give their reasons before imposing a maximum sentence." (Alterations omitted.) *Fernandez* at ¶ 7, quoting *Linde*, 2013-Ohio-3503, at ¶ 21. "Unless the record shows that the court failed to consider the factors, or that the sentence is 'strikingly inconsistent' with the factors, the court is presumed to

have considered the statutory factors if the sentence is within the statutory range." *Fernandez* at ¶ 8, quoting *State v. Boysel*, 2d Dist. Clark No. 2013-CA-78, 2014-Ohio-1272, ¶ 13.

**{¶45}** Henderson argues that the court erred in imposing a maximum sentence on his felonious assault count because: (1) the court did not impose a maximum sentence for the aggravated burglary despite finding that it was the worst form of that offense; and (2) the record does not demonstrate the court considered the statutory factors, but, instead, imposed the sentence to reach a specific number of years of incarceration.

**{¶46}** The judge conducting the sentencing hearing was the same judge that presided over Henderson's trial. At the sentencing hearing, defense counsel argued that Henderson had only one prior conviction and that it was not an offense of violence. Henderson repeatedly maintained that he did not shoot Ellis.

**{¶47}** The court initially imposed a ten-year sentence for aggravated burglary, an eight-year sentence for felonious assault, and a one-year sentence for having weapons while under disability. Additionally, the court imposed three years on each of the two firearm specifications; one attached to the aggravated burglary and one attached to the felonious assault. The court ordered the two firearm specifications to run concurrently, to be served prior and consecutive to the sentences for aggravated burglary and felonious assault. The court further ordered the aggravated burglary and felonious assault sentences to be served consecutively, but concurrent with the having weapons while under disability. Henderson's aggregate sentence of incarceration was 21 years.

**{¶48}** The State, then, asked the court to reconsider its sentence because, by statute, the firearm specifications must be served consecutively to one another and consecutive to the sentences for the underlying offense. The court then revised its sentence and reduced

Henderson's aggravated burglary sentence from ten years to seven years, keeping his sentence at a total of 21 years.

**{¶49}** Having presided over the jury trial, the sentencing judge was familiar with the evidence presented at trial. The crimes involved were violent. Ellis was shot four times and sustained serious injuries. His medical records were admitted into evidence and he testified that he had already had two surgeries and there were discussions about more in the future. Photographs of the very bloody scene were also admitted into evidence. Ellis testified that all of the blood in the photographs was his. Henderson had a prior drug conviction, and Moore testified that she knew Henderson had been involved in drugs and she was trying to get him to stop. Additionally, Henderson refused to accept responsibility.

**{¶50}** While the court did not specifically state at the sentencing hearing that it considered the purposes and principles of sentencing, we cannot conclude that the sentences are "strikingly inconsistent" with R.C. 2929.11 and R.C. 2929.12. *See Fernandez*, 2014-Ohio-3651, at ¶ 8. Nor can we conclude that the sentence imposed was unreasonable, arbitrary, or unconscionable. Because Henderson's sentence was not contrary to law or an abuse of the trial court's discretion, Henderson's third assignment of error, as it relates to his maximum sentence for felonious assault, is overruled.

## Consecutive Sentences

**{¶51}** Lastly, Henderson argues that the court erred in failing to make the statutorily required findings before imposing consecutive sentences.

**{¶52}** R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive

sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

Therefore, before a trial court may impose consecutive sentences, it must make three findings:

(1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the three particular findings set forth in R.C. 2929.14(C)(4)(a)-(c) applies.

[While the] trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, [ ] it has no obligation to state reasons to support its findings. Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry.

*State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 37.

**{¶53}** The court found that "the aggravated burglary, which someone is ultimately seriously physically harmed, is the most extreme version of the offense. To give [Henderson] a nonconsecutive sentence of the aggravated burglary and the felonious assault would demean the seriousness of the offense, it would fail to protect the public, [and] * * * concurrent sentences would not be sufficient." We conclude that these findings satisfy two of the three findings

required by R.C. 2929.14(C)(4): that consecutive sentences are necessary to protect the public from future crime or to punish the offender; and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.

**{¶54}** As to R.C. 2929.14(C)(4)(a)-(c), at the hearing, the court appeared to rely on R.C. 2929.14(C)(4)(b). The court noted that Henderson had committed multiple offenses, that there was serious physical harm, and to impose nonconsecutive sentences "would demean the seriousness of the offense." However, in the sentencing entry, the court relied on R.C. 2929.14(C)(4)(c) – Henderson's criminal history. There is no evidence in the record that a presentence investigation report was ordered. Henderson's attorney argued that while he had prior offenses, those offenses were not ones of violence and he had only one felony. The court makes no mention at the sentencing hearing of Henderson's criminal history as basis for imposing consecutive sentences.

**{¶55}** Because the court's finding at the sentencing hearing is in conflict with its judgment entry, we reverse and remand for resentencing. *See Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, at ¶ 29 (when imposing consecutive sentences the court must make the required findings at the sentencing hearing, yet, the court speaks through its journal entry). Henderson's third assignment of error, as it relates to his consecutive sentences, is sustained.

III

**{¶56}** Henderson's first and second assignments of error are overruled. His third assignment of error, as it relates to consecutive sentences, is sustained, and the remainder of that assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and remanded for resentencing.

Judgment affirmed in part,
reversed in part,
and cause remanded.

—

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
CARR, J.
CONCUR.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.