[Cite as *State v. White*, 2016-Ohio-4829.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 27683 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DIMITRY T. WHITE | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 2014 07 2199 (A) |

DECISION AND JOURNAL ENTRY

Dated: July 6, 2016

HENSAL, Judge.

{¶1} Dimitry White appeals his convictions in the Summit County Court of Common Pleas. For the following reasons, this Court affirms in part, and reverses in part.

I.

{¶2} The victim, Anthony Thomas, was shot and killed in the back yard of a known drug house located at 1007 Cole Avenue in Akron ("1007 Cole") the evening of July 11, 2014. A neighbor who heard the gunshots and witnessed a suspicious individual walking quickly down the street called the police. Police canvassed the area and obtained statements from several individuals inside 1007 Cole, as well as neighbors who saw the suspicious individual. As a result of their investigation, the police obtained an arrest warrant for Dimitry White. Officers located Mr. White on July 13, 2014, at his sister's house. Mr. White was arrested and charged with aggravated murder with a firearm specification, murder with a firearm specification, and having a weapon while under disability.

**{¶3}** The case proceeded to a jury trial. The State presented testimony from several witnesses who were inside 1007 Cole at the time of the shooting. These witnesses, most of whom were known by law enforcement to habitually use drugs and engage in prostitution, testified that they knew the victim, and that he was a drug dealer who often stayed in an upstairs bedroom at 1007 Cole. They also testified that the victim was not well liked, and that he wanted to be the "house." The "house" is the person in charge of 1007 Cole that obtains drugs for people and, in return, receives either a portion of the drugs or a fee. They relayed that at the time of the murder, Marlin Smith – who did not testify – was considered the "house."

**{¶4}** Witnesses testified that the victim and Mr. Smith had previously argued over who should be in charge of 1007 Cole, and that the victim had locked Mr. Smith and Mr. White out of the house a few days prior to the murder. According to one witness who was with the men while they were locked out, Mr. White brandished a silver gun and waved it in front of a window, telling the victim that he had to come out eventually, and that he was going to shoot him. The victim managed to exit 1007 Cole through a second-floor window without incident.

**{¶5}** Regarding the day of the murder, the witnesses from inside 1007 Cole testified that an intruder had entered the house in what appeared to be "a hit." The intruder went through each room, telling one witness to move because she was blocking a doorway. After apparently not finding who he was looking for, the intruder left. The witnesses heard gunshots shortly thereafter, although their testimony differed as to how much time had passed. Mr. White admits in his merit brief that the witnesses gave "similar but not identical physical descriptions of the intruder." That description was a tall, thin male wearing a red hooded sweatshirt and red sweatpants with pantyhose (or some other mask) covering his face, holding a silver gun.

{¶6} The State also presented testimony from several neighbors. One neighbor testified that she saw a tall person in a red jumpsuit jogging down the street after she heard the gunshots, but that she could not see the person's face. That neighbor's daughter, who called the police, testified that she saw a tall person wearing a black and red jumpsuit walking quickly down the street. She admitted, however, that she initially told the 911 dispatcher that the individual was wearing an all red jumpsuit, and that she saw him fidgeting with something in his hand. Another neighbor testified that she heard the gunshots and saw a thin person wearing a red hooded sweatshirt and red sweatpants walking quickly down the street. She testified that she could see his hands, and that he was a light-skinned black male. She also testified that she saw something silver in his hand, which she thought was a gun.

{¶7} The parties also stipulated to the playing of a video statement from another neighbor who was unavailable to testify at trial. That neighbor indicated that he saw an individual wearing red walking down the street immediately after he heard the gunshots. He described that individual as being less than six feet tall, which, Mr. White argues, does not match his height at 6' 4".

{¶8} Although the witnesses inside 1007 Cole initially denied being able to identify the intruder, several witnesses later identified Mr. White as the individual that had entered the home wearing red clothing. One witness testified that she initially lied to the police because Mr. White's family threatened her. Another witness testified that she initially lied because she was scared and did not want to believe that Mr. White killed the victim. These witnesses later identified Mr. White as the intruder based upon his physique, voice, and/or facial features that could be discerned despite the fact that his face was covered. Only one witness from inside 1007

Cole testified that he could not identify the intruder, but he further testified that, in his "heart of hearts[,]" he believed the intruder was Mr. White.

{¶9} The State also presented the testimony of Bobby Sue McGraw, who was not in 1007 Cole at the time of the intrusion or murder. Ms. McGraw testified that she had been to 1007 Cole earlier in the day and heard Mr. White and the victim arguing. She also testified that Mr. White had shown her a silver gun a few weeks prior to the murder, which he apparently bought for protection after being robbed. She further testified that Mr. White called her the night of the murder and said, "I can't believe I did this" multiple times.

{¶10} The State also presented testimony from a jailhouse informant who testified that Mr. White told him that he killed the victim, and was able to describe the manner in which the victim was shot. He testified that Mr. White also told him that he and the victim had been in an argument earlier that day, that he went to his sister's house and put on a burgundy jumpsuit over his clothes, and that he returned to 1007 Cole and waited in the back yard for the victim to arrive. Notably, one of the responding crime scene unit detectives testified that he observed bushes in the back yard that appeared to be disturbed, which led him to believe that the shooter could have been sitting or lying down, waiting for the victim to arrive.

{¶11} After the State rested, the defense moved for acquittal under Criminal Rule 29(A), which the trial court denied. The defense then presented testimony from several witnesses, including Mr. White's niece who provided an alibi, and a woman who claimed that one of the State's witnesses told her that she lied on the stand. Regarding his alibi, Mr. White's niece testified that Mr. White was with her and her mom (Mr. White's sister) the evening of the murder, and that she never heard him leave the house. According to her, Mr. White was in the house from Friday evening (the night of the murder) until Sunday, when he was arrested. On

cross-examination, she admitted that she initially told an officer that Mr. White arrived at their home on Saturday, not Friday, and that she was getting high the night of the murder.

{¶12} With respect to the alleged perjury, the defense's witness testified that Ms. McGraw told her that she got high before her testimony, and that she lied and made herself cry on the stand. She also testified that she saw detectives give Ms. McGraw money, which, she admitted, was probably for food. She further testified, however, that the detectives dropped Ms. McGraw off at a drug dealer's house, and that they knew she was going to use the money to buy drugs.

{¶13} After hearing the testimony of over 20 witnesses, the jury returned a verdict of guilty on all charges. Because the murder conviction merged with the aggravated murder conviction, the State elected to proceed with sentencing on the aggravated murder charge. The trial court sentenced Mr. White to 25 years to life for aggravated murder, 3 years for the firearm specification, and two years for having a weapon while under disability. The trial court ordered the sentences to run consecutively for a total prison sentence of 30 years to life. Mr. White appeals his convictions, raising four assignments of error for our review. For ease of consideration, we will address his assignments of error out of order.

II.

ASSIGNMENT OF ERROR II

DIMITRY WHITE'S CONVICTIONS FOR AGGRAVATED MURDER, MURDER, GUN SPECIFICATIONS, AND HAVING WEAPON WHILE UNDER DISABILITY WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10, & 16 OF THE OHIO CONSTITUTION.

{¶14} In his second assignment of error, Mr. White argues that his convictions are not supported by sufficient evidence. Whether a conviction is supported by sufficient evidence is a

question of law, which we review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In making this determination, we must view the evidence in the light most favorable to the prosecution:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶15} The jury found Mr. White guilty of aggravated murder under Revised Code Section 2903.01(A) with an accompanying firearm specification under Section 2941.145, murder under Section 2903.02(A) with an accompanying firearm specification under Section 2941.145, and having a weapon while under disability pursuant to Section 2923.13(A)(2). Regarding aggravated murder, Section 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." The murder statute, on the other hand, does not require prior calculation and design. *See* Section 2903.02(A). Section 2929.14(B)(1)(a)(ii) requires a mandatory three-year prison term if the defendant is found to have "used [a firearm] to facilitate the offense[.]" R.C. 2941.145(A). Lastly, Section 2923.13(A)(2) provides that "no person shall knowingly * * * use any firearm * * * if * * *[t]he person is under indictment for or has been convicted of any felony offense of violence[.]" There is no dispute that Mr. White had previously been convicted of a felony offense of violence for purposes of Section 2923.13(A)(2).

{¶16} Mr. White makes several arguments in support of his assignment of error. In summary, he argues that no eye witnesses identified him as the shooter, that no physical

evidence tied him to the crime, that he did not match the physical description given to the police, and that the State's witnesses were so unbelievable and "rife with undue influence" that no reasonable jury could have relied on them.

{¶17} The State, however, presented testimony from several witnesses that identified Mr. White as the intruder at 1007 Cole, and that described him as wearing red clothing with his hood up, and a mask over his face. The neighbors, none of whom were inside 1007 Cole when the intruder entered the home, described the person they saw fleeing down the street in similar attire. Although there were inconsistencies among the neighbors as to the height of the individual, three neighbors indicated that the person wearing red was tall. According to the lead detective on the case, Mr. White is approximately 6'4" in height, and everything pointed to the intruder and the individual seen fleeing down the street as being the same person: Mr. White.

{¶18} Mr. White concedes that "under normal circumstances," the numerous witnesses identifying him as the intruder would survive a sufficiency challenge. But in this case, he argues, their testimony was so unbelievable and "rife with undue influence" that no reasonable jury would have relied on them. More specifically, he challenges their testimony as being influenced by the prosecutors through money and/or consideration for their own criminal charges. Mr. White's argument in this regard, however, challenges the credibility of the witnesses and, therefore, goes to the weight of the evidence, not sufficiency. *State v. Violett*, 9th Dist. Medina No. 11CA0106-M, 2012-Ohio-2685, ¶ 7.

{¶19} Viewing the evidence in a light most favorable to the prosecution, the jury could have reasonably found the essential elements of the charged crimes proven beyond a reasonable doubt. Mr. White's second assignment of error is overruled.

ASSIGNMENT OF ERROR III

DIMITRY WHITE'S CONVICTIONS FOR AGGRAVATED MURDER, MURDER, GUN SPECIFICATIONS, AND HAVING WEAPON WHILE UNDER DISABILITY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶20} Mr. White also argues that his convictions are against the manifest weight of the evidence. If a defendant asserts that a conviction is against the manifest weight of the evidence,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence pertains to the greater amount of credible evidence produced in a trial to support one side over the other side. *Thompkins*, 78 Ohio St.3d, at 387. An appellate court should only exercise its power to reverse a judgment as against the manifest weight of the evidence in exceptional cases. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

{¶21} Mr. White argues that his convictions are against the manifest weight of the evidence for several reasons, including: (1) no physical evidence tied him to the home intrusion or the murder; (2) the description given to police matched Marlin Smith (the "house") and it was more reasonable to conclude that the witnesses inside 1007 Cole were covering for Mr. Smith because he sustained their drug addictions; and (3) the witnesses inside 1007 Cole initially denied being able to identify the intruder and were unduly influenced by the prosecutor.

{¶22} Regarding the lack of physical evidence, there is no dispute that the State based its case on circumstantial evidence. But as the Ohio Supreme Court has held, "circumstantial evidence alone may be sufficient to support a conviction for murder." *State v. Nicely*, 39 Ohio

St.3d 147, paragraph one of the syllabus (1988). As it relates to Marlin Smith, the record reflects that Mr. Smith was wearing red sweatpants the night of the murder, and that he matched the height description given in the 911 "BOLO" (i.e., "[b]e on the lookout") report. Several witnesses testified, however, that Mr. Smith was inside 1007 Cole when the intruder entered the house and when they heard gunshots. Further, a gunshot residue test performed on Mr. Smith produced negative results.

{¶23} Lastly, regarding the credibility of the witnesses, "[c]redibility determinations are primarily within the province of the trier of fact." *State v. Just*, 9th Dist. Wayne No. 12CA0002, 2012-Ohio-4094, ¶ 42. That is because "the [jury] is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." (Alteration sic.) *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993). In doing so, "the jury is free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35.

{¶24} As it relates to the prosecutor's alleged influence over the witnesses, the prosecutor asked several witnesses on direct examination whether they received any sort of deal to testify against Mr. White. They indicated they had not. On cross-examination, the jailhouse informant did testify that he expected "some consideration" for his testimony, but also stated that the prosecutor made it clear to him that a deal "wasn't even on the table[.]" Further, one of the officers testified that he did not promise anything to any of the witnesses in return for their statements.

{¶25} Here, the jury reviewed all of the evidence and assessed the credibility of the witnesses, many of whom admitted to engaging in prostitution and habitual illegal drug use,

resulting in criminal convictions. Having reviewed the record, we cannot say that the jury clearly lost its way when it accepted the State's version of the events. *See Thompkins*, 78 Ohio St.3d, at 387. Mr. White's convictions, therefore, are not against the manifest weight of the evidence. Mr. White's third assignment of error is overruled.

### ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES UPON DIMITRY WHITE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶26} In his fourth assignment of error, Mr. White argues that the trial court erred by imposing consecutive sentences. More specifically, he argues that the trial court's findings at the sentencing hearing conflict with those contained in the court's journal entry.

{¶27} Revised Code Section 2929.14(C)(4) governs consecutive sentences. As this Court has stated,

> [B]efore a trial court may impose consecutive sentences, it must make three findings: (1) that consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the three particular findings set forth in R.C. 2929.14(C)(4)(a)-(c) applies.

*State v. Henderson*, 9th Dist. Summit No. 27078, 2014-Ohio-5782, ¶ 52. Subsections (a) through (c) provide as follows:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶28} While "a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, * * * it has no obligation to state reasons to support its findings. Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 37.

{¶29} Mr. White challenges the trial court's findings as they relate to subsections (a) through (c) only. In this regard, he argues that the trial court relied upon subsection (b) (i.e., two of the offenses were committed as part of one or more courses of conduct) during the sentencing hearing, but that the journal entry relies upon subsection (c) (i.e., Mr. White's prior criminal history demonstrated that consecutive sentences were necessary to protect the public from future crimes). The State concedes that the trial court relied upon subsection (c) in its journal entry, but argues that the trial court was also aware of Mr. White's criminal record at the sentencing hearing.

{¶30} Our review of the record, however, indicates that the trial court specifically relied upon subsection (b), that is, that two of the offenses were committed as part of one or more courses of conduct, at the sentencing hearing. "Because the court's finding at the sentencing hearing is in conflict with its judgment entry, we reverse and remand for resentencing." *Henderson*, 2014-Ohio-5782, at ¶ 55. Accordingly, Mr. White's fourth assignment of error is sustained.

ASSIGNMENT OF ERROR I

THE PROSECUTOR'S REMARKS IN CLOSING ARGUMENT WERE PROSECUTORIAL MISCONDUCT THAT DEPRIVED DIMITRY WHITE OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF HIS 5TH, 6TH, AND 14TH AMENDMENTS RIGHTS UNDER THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶31} In his first assignment of error, Mr. White argues that the prosecutor's remarks during closing argument deprived him of a fair trial. Specifically, Mr. White argues that the prosecutor engaged in prosecutorial misconduct by stating that the detectives gave Ms. McGraw money for food, not to lie on the stand, evidence of which was not admitted at trial. He also argues that his trial counsel failed to request a limiting jury instruction on this issue. Mr. White further argues that the prosecutor engaged in misconduct by stating: "I don't like that" in reference to defense counsel's ability to address certain issues during closing argument.

{¶32} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Geiger*, 9th Dist. Medina No. 12CA0006-M, 2012-Ohio-4002, ¶ 8, quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "To establish prejudice, an accused must show that there is a reasonable probability that, but for the prosecutor's improper remarks, the result of the proceeding would have been different." *State v. Hodge*, 9th Dist. Lorain No. 98CA007056, 2000 WL 1533917, *7 (Oct. 18, 2000). We must "view the [prosecutor's] closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial." *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001).

{¶33} With respect to Ms. McGraw, the prosecutor stated: "take [Ms. McGraw] for whatever you want, but I'll tell you, nobody paid [her] to come in and say anything." The prosecutor further indicated that his office provided Ms. McGraw with a hotel room for safety,

and, on rebuttal, stated that the detectives gave her money for food.  The State argues that Mr. White failed to object to these statements at trial and, therefore, has forfeited all but plain error. In response, Mr. White argues that his trial counsel did object to the prosecutor's statements, but he concedes that his trial counsel failed to request a limiting jury instruction on this issue.  More specifically, he argues that a specific jury instruction was required to reinforce to the jury that the personal assurances of counsel are improper and must be disregarded, and that it was plain error to not give such a curative instruction.  Mr. White acknowledges that the trial court did instruct the jury that closing arguments are not evidence, but he argues that this instruction alone "cannot be reasonably believed to cure the knowing interjection of personal assurances given by the prosecutor."

{¶34}  Mr. White relies upon *State v. Smith*, 14 Ohio St.3d 13 (1984), for the proposition that the trial court's single instruction to the jury that closing arguments are not evidence was insufficient to correct any error under these circumstances.  In *Smith*, the assistant prosecutor referred to the defense's evidence as "'lies,' 'garbage,' 'garbage lies,' '[a] smoke screen,' and 'a well conceived and well rehearsed lie.'"  (Alteration sic.)  *Id.* at 14.  The Court noted that there was no evidence to substantiate the assistant prosecutor's allegations, and that "[s]uch conduct is well beyond the normal latitude allowed in closing arguments and is clearly improper."  *Id.*  The Court, therefore, held that "in cases of such flagrant misconduct on the part of the prosecution as was present here, the general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error."  *Id.* at 15.

{¶35}  Based upon our review of the record, we do not find that the prosecutor's statements during closing argument rose to the level of "flagrant misconduct" as contemplated under *Smith* such that the trial court's instruction to the jury did not correct any error.  *Compare*

*State v. Harris*, 9th Dist. Lorain No. 11CA009991, 2012-Ohio-2973, ¶ 13-16 (holding that the prosecutor committed "flagrant misconduct" when she referred to the defendant's post-arrest, post-*Miranda* silence during closing argument, repeated the defendant's lone statement to the police and queried as to whether an innocent person would have said more, repeatedly opined that the victim was credible, and commented on the quality of the defense, stating that it was "bull" and "smoke and mirrors[.]"). Further, we note that "[i]t is presumed that the jury will follow the court's instructions." *State v. Manor*, 9th Dist. Summit No. 14376, 1990 WL 73651, *1 (May 30, 1990).

{¶36} We now turn to the prosecutor's statement of "I don't like that" during closing argument. Mr. White concedes that defense counsel failed to object to this statement at trial. We, therefore, apply a plain error standard of review. *State v. Reed*, 9th Dist. Wayne No. 12CA0051, 2013-Ohio-3970, ¶ 65. The doctrine of plain error requires that there must be: (1) a deviation from a legal rule; (2) that is obvious, and; (3) that affects the appellant's substantial rights. *State v. Hardges*, 9th Dist. Summit No. 24175, 2008–Ohio–5567, ¶ 9. An error affects the appellant's substantial rights if it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶37} The parties disagree about what the prosecutor meant when he said "I don't like that" during his closing argument. The statement occurred during the prosecutor's discussion regarding the State's witness who testified that, in his "heart of hearts[,]" he believed, but did not know, that Mr. White was the intruder at 1007 Cole. After discussing his testimony, the prosecutor stated that defense counsel "d[oesn't] have to give a closing argument, but if he does,

I'm sure that will probably be addressed. I don't like that." Mr. White argues that the State was referring to his counsel's ability to address the State's witness's testimony. The State, on the other hand, argues that the prosecutor was simply summarizing what he believed defense counsel was thinking in regards to its witness's testimony.

{¶38} Even assuming that Mr. White's interpretation of the prosecutor's comment is correct, we cannot say that the result of the trial would have been different but for his comment. Mr. White, therefore, cannot establish plain error. In light of the foregoing, Mr. White's first assignment of error is overruled.

III.

{¶39} Mr. White's first, second, and third assignments of error are overruled. Mr. White's fourth assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and remanded for resentencing.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
JENNIFER HENSAL
FOR THE COURT

CARR, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.